**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**WESTERN DIVISION**

| | | |
|---|---|---|
| **LAKEESHA ROBINSON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 3:24 C 50062** |
| | ) | |
| **ILLINOIS DEPARTMENT OF HUMAN SERVICES d/b/a JACK MABLEY DEVELOPMENTAL CENTER,** | ) | **Judge Rebecca R. Pallmeyer** |
| | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION AND ORDER**

From April 12, 2023, to September 29, 2023, Plaintiff Lakeesha Robinson ("Plaintiff") was a registered nurse assigned to work with Defendant Illinois Department of Human Services ("Defendant" or "IDHS"). Plaintiff was assigned by a temporary staffing agency, Favorite Healthcare Staffing ("Favorite"), to work at IDHS's Jack Mabley Developmental Center ("JMDC") in Dixon, Illinois. In this role, one of Plaintiff's job duties included one-on-one supervision of residents at JMDC who require constant medical supervision by a healthcare provider who remains within arm's reach. In this lawsuit, Plaintiff, who is African American, alleges that IDHS discriminated against her on the basis of race by disproportionately assigning her to this 1:1 supervision, causing physical injury to her knees that ultimately required medical treatment. She also claims that IDHS did not allow her to take breaks, repeatedly assigned her to care for dangerous patients, and failed to address her reports of race-based harassment by coworkers. Plaintiff ultimately declined to extend her contract term at JMDC; while she remained eligible for nursing assignments by Favorite, she claims that IDHS's conduct amounts to constructive discharge. She brings claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-5, alleging race discrimination and hostile work environment. Defendant has moved [75] for summary judgment. As explained below, this motion is granted.

# BACKGROUND

## I. Factual Background

The facts laid out below are taken from the parties' respective Local Rule 56.1 filings, as well as the record evidence submitted by both parties.[1] As it must at summary judgment, the court takes disputed facts in the light most favorable to the non-moving party. *See In re Greenpoint Tactical Income Fund LLC*, 168 F.4th 1002, 1007 (7th Cir. 2026).

### A. Joint Employment: Illinois Department of Human Services and Favorite Healthcare Staffing

Defendant IDHS is an agency of the State of Illinois, 20 ILCS 5/5-15, and operates the JMDC in Dixon, Illinois. (DSOF [76] ¶ 1.) JMDC is comprised of seven homes, each housing approximately 112–114 residents with developmental disabilities. (*Id.* ¶ 21.) IDHS maintains medical staff on site who are trained in application of restraints, de-escalation techniques, and other procedures relevant to working at JMDC. (*Id.* ¶¶ 19–20 .)

In response to staffing shortages during the COVID-19 pandemic, IDHS contracted with staffing agencies—including Favorite—to provide "temporary medical personnel to any DHS site or project statewide." (*Id.* ¶ 2.) IDHS's 2022 contract with Favorite provided that "personnel assigned will assist with the care and treatment of individuals during the COVID-19 outbreak" and "will provide additional resources to DHS facilities and projects that are understaffed." (*Id.* ¶ 4.) The contract set the hourly rate that IDHS would pay Favorite for medical services, including the services of nurse practitioners ("NP") and registered nurses ("RN"). (*Id.* ¶ 5.) The contract provided that Favorite "shall act as an independent contractor and not an agent or employee of,

---

[1] Defendant's Local Rule 56.1 Statement of Material Facts is cited here as "DSOF [76] ¶ ___." Plaintiff's Response to Defendant's Local Rule 56.1 Statement is cited here as "Pl.'s Resp. to DSOF [82] ¶ ___." Plaintiff has also submitted an Additional Statement of Facts, cited here as "PSOF [83] ¶ ___." Defendant's Response to Plaintiff's Additional Statement of Facts is cited here as "Def.'s Resp. to PSOF [90] ¶ ___."

or joint venture with the State." (*Id.* ¶ 6.) The contract further specified that Favorite could not subcontract the services it provided to IDHS and that

> [t]he Vendor [Favorite] is an independent contractor under this Contract and neither the Vendor nor any employee or agent of the Vendor is an employee of DHS and does not acquire any employment rights with DHS or the State of Illinois by venture of this Contract. The Vendor will provide the agreed services and achieve the specified results free from the direction or control of DHS as to the means and methods of performance. The Vendor will be required to provide its own equipment and supplies necessary to conduct its business; provided that in the event that, for its convenience or otherwise, DHS makes any such equipment, supplies or both available to the Vendor, the Vendor's use of such equipment or supplies provided by DHS pursuant to this Contract shall be strictly limited to official DHS or State of Illinois business and not for any other purpose, including any personal benefit or gam.

(*Id.* ¶ 7.) Favorite agreed to "use its best efforts to recruit and provide, at the request of DHS, clinical and support personnel for assignments." (*Id.* ¶ 8.)

The essential functions of a nurse at JMDC involved "[p]rovid[ing] professional nursing care to individuals served on an assigned shift." (*Id.* ¶ 19.) Nursing duties include, *inter alia*, "[i]mplement[ing] physician orders as written . . . [m]onitor[ing] vital signs and physical conditions and reactions to treatments . . . [p]rovid[ing] emergency treatment, implement[ing] emergency procedures . . . [m]aking rounds of homes, consulting with physicians and other professional staff regarding the individuals' treatment and care." (*Id.* ¶ 20.) Contractual agency nurses "were trained and completed the same workload as [IDHS] internal hires," and their duties were determined by "the same job description as [IDHS's] internal hires and the title that they are hired for." (PSOF [83] ¶ 4.)

The parties disagree on many aspects of the IDHS-Favorite relationship. One factor is discipline. Staffing agency nurses are classified as contractual employees, and as such, are not subject to the applicable collective bargaining agreement ("CBA") between the Illinois Nurses Association and the State of Illinois. (DSOF [76] ¶ 9.) Staffing agency nurses are therefore not officially IDHS employees. (*Id.*) Defendant argues that these facts mean that IDHS "did not control discipline of staffing agency nurses" provided by Favorite to serve under the contract with

Defendant, and instead could only make *recommendations* to Favorite about disciplining employees. (*Id.* ¶ 10–11.) Defendant also points to the language of its agreement with Favorite, in which Favorite agreed to

> [a]ssume and thereafter maintain sole and exclusive responsibility as the lawful employer of record for all purposes, including but not limited to the full and timely: (i) payment of wages to TSPs; [(ii)] the withholding of all applicable federal, state and local income and other taxes; (iii) the making of required Social Security tax contributions; and (iv) meeting of all other statutory employer responsibilities, including, but not limited to unemployment and worker's compensation insurance, payroll excise taxes, etc.

(*Id.* ¶ 12.) Debra Muhlstadt,[2] IDHS's Rule 30(b)(6) corporate representative, testified that IDHS facilities set the schedule for nurses from staffing agencies, but can only make "recommendations" as to disciplining any particular employee. (Muhlstadt Dep. [76-2] at 19:2–20:10.) She acknowledged, however, that IDHS's "recommendations for discipline get carried out" roughly "99 percent of the time." (*Id.* at 20:11–13.)

Plaintiff contends that IDHS effectively supervised her—she asserts that IDHS had "meaningful supervisory control" and "day-to-day control" over her work, even if IDHS lacked formal disciplinary powers. (Pl. Resp. to DSOF [82] ¶ 11.) Thus, she asserts, "IDHS determined which agency nurses could work at its facilities, controlled Plaintiff's work schedule and day-to-day job assignments, and supervised her work pursuant to the same job descriptions and expectations applied to internal IDHS nurses." (*Id.* ¶ 9.) She also contends that Anna Powell, a nurse who held the job title of RN 2, "scrutinized [Plaintiff's] work, attempted to find grounds for discipline, and manipulated her assignments in a punitive manner." (*Id.* ¶ 10.) Plaintiff claims that Powell and other RN 2 nurses had "supervisory authority over agency nurses" (PSOF [83] ¶ 14, Pl. Dep [76-10] at 44:2–11), though the material she cites—portions of her own deposition—refer only to Ms. Powell's authority to dictate day-to-day work assignments. (Pl. Dep. [76-10] at 132:3–7;

---

[2] Ms. Muhlstadt is the Lead Fiscal Administrator in the Department of Human Services, Division of Developmental Disabilities for the State of Illinois. (Muhlstadt Dep. [76-2] at 8:1–11.)

136:18–137:1.) Plaintiff admits that RN 2s lacked authority to hire, terminate, or discipline other nurses. (Pl. Resp. to DSOF [82] ¶ 34.)

The parties do largely agree on how staffing works at particular IDHS facilities. When IDHS needed nurses for a particular facility, Favorite "presented" candidates to IDHS, and IDHS then "reviewed the candidates' background and experience" and selected appropriate candidates. (PSOF [83] ¶¶ 2–3; DSOF [76] ¶¶ 13, 15; *See* Def. Resp. to PSOF [90] ¶¶ 2–3.) IDHS made decisions about who worked in their facilities, and Favorite could not "unilaterally place one of their recruits . . . without IDHS's approval." (PSOF [83] ¶ 3.) IDHS could reject nurses for various reasons, including errors "that caused harm to an individual served; flagrant tardiness or call-offs; no call, no show; abandoning their position; leaving their shift; payroll fraud." (DSOF [76] ¶ 17 (undisputed).) Finally, day-to-day assignments for contract nurses were controlled by IDHS, as described below. (PSOF [83] ¶ 5 (undisputed).)

### B. 1:1 Supervision Assignments

Plaintiff is an African American RN who was employed by Favorite from April 12, 2023, through September 29, 2023. (PSOF [83] ¶ 1; DSOF [76] ¶¶ 39–40). During the relevant time period, she was assigned, with IDHS approval, to work at JMDC; she claims IDHS discriminated against her in job assignments at JMDC. Some background: As noted, residents of JMDC at times require constant medical 1:1 supervision by a healthcare provider who is within arm's reach. (DSOF [76] ¶ 25.) When operational needs allow, Defendant uses nurses for this 1:1 supervision because of the training nurses have and the accompanying level of care they can provide. (*Id.* ¶ 26.) When needed, any nurse could be assigned to 1:1 supervision, up to and including JMDC's Director of Nursing, Bradley Ohlwine. (*Id.* ¶ 27 (undisputed).) But Plaintiff contends that she was repeatedly and disproportionately assigned to 1:1 sitting, even when not scheduled to do so, compared with her similarly situated white coworkers. (Pl. Resp. to DSOF [82] ¶ 26.)

All parties agree that the primary responsibility for assigning nurses to 1:1 supervision rested with Ohlwine, who "set the schedule of nursing assignments each week for JMDC." (DSOF

[76] ¶ 30.) In doing so, Ohlwine was required, evidently by the nurses' collective bargaining agreement, to first utilize a nurse from a staffing agency for a 1:1 assignment before calling on an IDHS staff nurse—likely because the 1:1 assignment was disfavored by the nurses.[3] (*Id.* ¶ 32.) Ohlwine was not the only individual who could assign nurses to the 1:1 supervision role. If a nurse scheduled for 1:1 duty called off her shift and Ohlwine was not present, an RN2 on duty could designate another nurse on that shift to cover the 1:1 supervision role. (*Id.* ¶ 33.) When such changes were made, they were supposed to be recorded in handwritten notations on the nurse schedules. (*Id.* ¶ 35.) While all agree that RN2s did not have the ability to hire, fire, or discipline other employees (*id.* ¶ 34), Plaintiff contends that RN2s—including Powell and Lance Merrill (another IDHS RN2)—controlled Plaintiff's day-to-day assignments, supervised her work, received her complaints, and were responsible for elevating issues to higher-level supervisors." (Pl. Resp. to DSOF [82] ¶ 34.)

Plaintiff claims that she was assigned to 1:1 supervision more often than her white coworkers. IDHS written work schedules show, instead, that 1:1 supervision was assigned, roughly proportionately, among the nurses. Those records show that Plaintiff was assigned to 1:1 supervision on 30 out of 91 worked shifts (33% of her shifts). (*Id.* ¶¶ 43; *See* Ohlwine Decl. [76-1] ¶ 7.) By comparison, Plaintiff's white coworkers Tracey Bide, Jill Smoode, and Natalie Rinaldo were assigned to 1:1 supervision on 33%, 19%, and 32% of their shifts, respectively. (Pl. Resp. to DSOF [82] ¶¶ 56–57; *See* Ohlwine Decl. [76-1] ¶ 7.) But Plaintiff claims that she in fact was assigned to 1:1 supervision far more often than what appears in the official schedules. She testified at her deposition that RN2 nurses, including Powell, made sure that Plaintiff was assigned

[3] At least one RN2 employed by IDHS, Lance Merrill, asserted that she did not consider 1:1 supervision a lesser assignment as compared with other nursing duties. (DSOF [76] ¶ 54.) Plaintiff notes, however, that Merrill expressly testified that nurses "frequently complained" about the 1:1 sitter role and considered it a less desirable assignment, particularly when required for extended periods. (Pl. Resp. to DSOF [82] ¶ 54.) That the union challenged such assignments by way of a grievance satisfies the court for purposes of this decision that 1:1 supervision assignments were undesirable.

to 1:1 supervision, regardless of operational needs, while white nurses, especially Powell's friend Jill Smoode (another nurse employed by the staffing agency), were not given the 1:1 assignments. (Pl. Resp. to DSOF [82] ¶ 38; Ohlwine Decl. [76-1] ¶ 7.) These changes were evidently not recorded on IDHS records; Plaintiff claims that the schedules were frequently altered, sometimes multiple times in a single day, and that many daily changes were not handwritten on the master schedule. (Pl. Resp. to DSOF [76] ¶ 35.) RN2 Merrill confirmed that sitting assignments could have been changed without being recorded on the schedule. (*Id*. ¶ 36.) Plaintiff alleges that the prolonged sitting without breaks caused significant pain and physical injury to her knees, ultimately requiring medical treatment and injections to manage the resulting knee damage. (PSOF [83] ¶ 13.) She offers no medical records or other evidence of this injury beyond her own testimony and does not explain how sitting caused or exacerbated a knee injury.

### C. Racial Discrimination and Harassment

In addition to unfair work assignments, Plaintiff claims that she suffered race-based discrimination and harassment at work. When, whether, and how she reported the harassment to supervisors is disputed. During her orientation at JMDC, Plaintiff was given materials that included JMDC's policies and procedures, including its anti-discrimination and anti-harassment policies. (Pl. Resp. to DSOF [82] ¶¶ 41, 42.) [4]

---

[4] It is undisputed that both IDHS and Favorite have written policies that prohibit discrimination and harassment and encourage affected workers to file a complaint. The IDHS policy concerning Non-discrimination/Anti-Harassment/Anti-Sexual Harassment/Anti-Retaliation Regarding Employees and Individuals states:

> Employees shall refrain from discrimination, harassment, and sexual harassment in the workplace and shall also refrain from retaliating against any individual who has opposed such conduct. Any employee who discriminates, harasses, sexually harasses, or retaliates against a fellow worker will be held accountable for his or her individual conduct. Any employee who engages in discriminatory, harassing, sexually harassing or retaliatory behavior may be subject to disciplinary action, up to and including discharge, in accordance with the appropriate DHS policy, personnel rules, and applicable bargaining unit agreements.

(IDHS Administrative Responsibilities, Ex. 13 to DSOF [76-13] at 6.) The means for reporting discrimination or harassment are:

On September 4, 2023, at 2:41 a.m., Plaintiff sent Ohlwine a text message stating that she has "been confronted with a lot of strife and condescending attitudes from the staff on Keller" and that she felt harassed. (DSOF [76] ¶ 45.) In this text message, Plaintiff did not mention race as the reason for the harassment or discrimination she was experiencing. (*Id.* ¶ 50.) Plaintiff did, however, identify two mental health technicians in the text message whom she described as "disrespectful, rude, [and] demeaning," and claimed they "contributed to a hostile work environment." (Pl. Resp. to DSOF [82] ¶ 46.) She testified further that this mistreatment was part

---

> Any employee who feels discriminated against or harassed on the basis of protected characteristics as defined under the definitions of "Discrimination" and "Harassment" and any employee who feels he or she has been sexually harassed or retaliated against within the meaning of "Sexual Harassment" or "Retaliation" has the right to file a complaint with the BCA. The complaint should be initiated in writing within 30 work days of the alleged incident using the Internal Discrimination Complaint form (IL4444-4027) or (IL4444-4027S) Spanish form.

(*Id*. at 6–7.) Favorite's Employee handbook also included an antidiscrimination provision and directions for reporting violations:

> Favorite Healthcare Staffing is committed to a work environment in which all individuals are treated with respect and dignity. Everyone has the right to work in a professional atmosphere that promotes equal employment opportunities and prohibits unlawful discriminatory practices, including harassment.
>
> Therefore, Favorite Healthcare Staffing expects that all relationships among persons in the office will be business-like and free of bias, prejudice, and harassment.
>
> It is the guideline of Favorite Healthcare Staffing to ensure equal employment opportunity without discrimination or harassment on the basis of race, color, religion, gender, sexual orientation, gender identity, national origin, age, disability, genetic information, marital status, or veteran status. Favorite Healthcare Staffing prohibits any such discrimination or harassment.
>
> Favorite Healthcare Staffing encourages reporting of all perceived incidents of discrimination or harassment. It is the guideline of Favorite Healthcare Staffing to investigate such reports promptly and thoroughly. Favorite Healthcare Staffing prohibits retaliation against any individual who reports discrimination or harassment or who participates in an investigation of such reports.

(Employee Handbook, Ex. 14 to DSOF [76-14] at 8.)

of a broader pattern of discriminatory behavior not limited to those two technicians. (*Id.* (citing Pl. Dep. [76-10] at 36:10–37:12; 61:14–62:20; 62:21–63:25; 68:11–16; 68:25–70:20).) At 7:38 a.m. that same morning, Ohlwine responded to Plaintiff's text message, asking her "when would you like to meet and discuss."[5] (DSOF [76] ¶ 47.) How Plaintiff responded is not clear from the screenshots in the record, but the two did meet later (the exact date of this meeting is unclear). It appears that Plaintiff voiced objections to being assigned to work at a location referred to as the "Keller home"; she does not explain the significance of this assignment, but the court infers that she views it as unfavorable. (DSOF [76] ¶ 48.) Ohlwine agreed to place Plaintiff on shifts avoiding the Keller home. (*Id.* ¶ 48.) Because Plaintiff's text message concerned two mental health technicians not under Ohlwine's chain of command, Ohlwine also spoke with their supervisor. (*Id.* ¶ 49.) Ohlwine testified that "reports of staff being rude . . . were immediately followed up the next business day once I have received them." (*Id.* ¶ 29.) According to Plaintiff, however, despite her reporting the technicians' hostile and discriminatory conduct, the mistreatment continued, and "no substantive steps were taken to stop the harassment or prevent further incidents." (Pl. Resp. to DSOF [82] ¶ 49.)

Defendant notes that Plaintiff's original text message did not include specific mention of racial discrimination or racial harassment. (DSOF [76] ¶¶ 50 (undisputed in relevant part), 51.) Plaintiff acknowledges that her text message did not mention race discrimination (Pl. Resp. to DSOF [82] ¶ 50), but she claims she made various in-person reports to Ohlwine, Powell, Merrill, and Charge Nurse Jennifer Garnett that she "was being targeted 'because [she] was Black.'" (*id.* ¶ 51). The date of these reports is not in the record. Plaintiff also claims that she heard a coworker refer to her as a "Black B—," but that she was not sure, and that an (unnamed)

[5] Whether Plaintiff responded to Ohlwine's response is not clear from the screenshots in the record. (Text Messages [76-12].)

supervisor heard this remark and failed to intervene.[6] (*Id.* ¶ 52; Pl. Dep. [76-10] at 64:18–65:18.) Plaintiff further claims that she relayed these concerns to a recruiter at Favorite, but does not specify the date of this report or to whom it was made. (*See id.*)

IDHS, for its part, denies ever being notified by Favorite that Plaintiff complained of racial discrimination or racial harassment. (DSOF [76] ¶ 52.) Plaintiff claims that her "supervisor" at Favorite informed IDHS of her complaint, but again, she does not name the supervisor and cites to no admissible evidence supporting her belief that Favorite communicated with IDHS about her complaints. (Pl. Resp. to DSOF [82] ¶ 52.)

**D. Plaintiff's Separation from Favorite**

According to Plaintiff, the excessive 1:1 supervision assignments and harassment caused her to end her stint at JMDC, and her employment with Favorite altogether. When Plaintiff was approaching the completion of her first contract term at JMDC, Plaintiff's recruiter at Favorite informed Plaintiff that she could be renewed for a subsequent 3-month term at JMDC. (*Id.* ¶ 62.) Plaintiff requested a change in duties from 1:1 supervision assignments; she was told (it is unclear by whom) that operational needs would allow her to be utilized less frequently for 1:1 supervision assignments if she worked during the day shift, and that she could be moved to the day shift for the upcoming three-month term. (*Id.* ¶ 63.) Ohlwine confirmed that Plaintiff met JMDC's performance expectations. (PSOF [83] ¶ 7.) But Plaintiff chose not to renew her term at JMDC. (DSOF [76] ¶ 64.)

Plaintiff remained on Favorite's nurse roster after refusing further assignment at JMDC. (*Id.* ¶ 65.) Defendant claims that Plaintiff was offered assignments at other locations, but declined those assignments as she did not "want to . . . work at any other facility under Favorite." (*Id.* ¶ 66.) Plaintiff claims that this is misleading, and notes that Favorite repeatedly attempted to assign

---

[6] Plaintiff's LR 56.1 statement claims that a "supervisor personally observed" this remark and "failed to intervene," but the cited portions of the record do not support that claim. (PSOF [83] ¶ 22.)

Plaintiff to other positions, but these positions were taken by other nurses before Plaintiff started work. (Pl. Resp. to DSOF [82] ¶ 66; Pl. Dep. [76-10] at 172:1–173:23.) Plaintiff testified, during her deposition, that she did turn down assignments to work at different IDHS facilities because she felt that Favorite did not properly advocate for her during her time at JMDC. (*Id;* Pl. Dep. [76-10] at 172:19–173:9.)

## II. Procedural History

Plaintiff filed a complaint of race discrimination with the Equal Employment Opportunity Commission on February 7, 2024. ([1-1]) After receiving a right-to-sue letter on January 23, 2024 ([1-4]), she filed this lawsuit, bringing claims of race-based discrimination and hostile environment under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* Defendant's motion for summary judgment [75] is now fully briefed.

## LEGAL STANDARD

Summary judgment is appropriate if "there is no genuine dispute as to any material fact," and the moving party "is entitled to judgment as a matter of law." *Levitin v. Nw. Cmty. Hosp.*, 923 F.3d 499, 501 (7th Cir. 2019) (quoting FED. R. CIV. P. 56(a)). "A genuine issue of material fact exists when 'there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.'" *Trahanas v. Nw. Univ*., 64 F.4th 842, 852 (7th Cir. 2023) (quoting *Brown v. Osmundson*, 38 F.4th 545, 549 (7th Cir. 2022)). In considering a motion for summary judgment, the court construes the facts in the light most favorable to the non-moving party and draws "all reasonable inferences in [her] favor." *Blumenshine v. Bloomington Sch. Dist. No. 87*, 150 F.4th 882, 886 (7th Cir. 2025). "'An inference is not reasonable if it is directly contradicted by direct evidence provided at the summary judgment stage, nor is a 'conceivable' inference necessarily reasonable at summary judgment.'" *Downing v. Abbott Lab'ys*, 48 F.4th 793, 815 (7th Cir. 2022). The court does not "weigh evidence or determine the credibility of a witness's testimony." *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011) (citation and internal quotation marks omitted). Such questions are left for the finder of fact. (*Id.*)

To survive a motion for summary judgment, the opposing party must "set forth specific facts showing a genuine issue for trial." *Abrego v. Wilkie*, 907 F.3d 1004, 1012 (7th Cir. 2018) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986)). They must produce affirmative evidence supporting a jury finding in their favor; they may not rest on conjecture, speculation, or unsupported allegations in the pleadings. *See Anderson v. Street*, 104 F.4th 646, 651 (7th Cir. 2024); *see also Igasaki v. Ill. Dep't of Fin. & Pro. Regul.*, 988 F.3d 948, 959 n.5 (7th Cir. 2021).

## DISCUSSION

### I. Race-Based Discrimination

Plaintiff first brings a Title VII race-discrimination claim. Title VII prohibits employers from discriminating against employees with respect to compensation, terms, conditions, or privileges of employment, because of race. 42 U.S.C. § 2000e-2(a)(1). To survive summary judgment on her discrimination claim, Plaintiff "must produce evidence that would let a reasonable factfinder find" that her race "caused an adverse employment action." *Paterakos v. City of Chicago*, 147 F.4th 787, 795 (7th Cir. 2025); *see also Mitchell v. Exxon Mobil Corp*., 143 F.4th 800, 809 (7th Cir. 2025).

Plaintiff contends that she was (1) repeatedly assigned to the inferior "sitter" role; (2) not allowed to take breaks; and (3) repeatedly assigned to dangerous patients. (Second Am. Compl. [32] ¶ 52.) As explained below, these theories do not support a claim of race discrimination.

#### A. Prima Facie Case of Discrimination

The parties organize their evidence by reference to the *McDonnell Douglas* framework. *McDonnell Douglas Corp v. Green*, 411 U.S. 792 (1973). To survive summary judgment, Plaintiff must show "(1) she is a member of a protected class, (2) she was meeting the employer's legitimate expectations, (3) she suffered an adverse employment action, and (4) similarly situated employees who were not members of her protected class were treated more favorably." *Abebe v. Health & Hosp. Corp. of Marion Cty.,* 35 F.4th 601, 606 (7th Cir. 2022) (quoting *Simpson v.*

*Franciscan All.*, 827 F.3d 656, 661 (7th Cir. 2016)); *see also Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765-66 (7th Cir. 2016) (expressing alternatives to *McDonnell Douglas*). "The burden then shifts to the employer to present a 'legitimate, non-discriminatory reason' for the employment decision.'" *Vichio v. US foods, Inc.*, 88 F. 4th 687, 691 (7th Cir. 2023) (citing *Bless v. Cook Cnty. Sheriff's Off.*, 9 F. 4th 565, 574 (7th Cir. 2021)). "If the employer presents a legitimate reason, the burden shifts back to the employee to show the proffered reason is a pretext for discrimination." (*Id.*)

It is undisputed that Plaintiff—an African American—is a member of a protected class due to her race, and that she was meeting IDHS's legitimate expectations. (*See* (PSOF [83] ¶ 7; Def.'s Resp. to PSOF [90] ¶ 7 (Ohlwine confirming Plaintiff's satisfactory performance).) IDHS argues, however, that Plaintiff did not suffer any adverse employment action and has not shown that similarly situated employees who were not members of her protected class were treated more favorably. (Def.'s Mem. in Support of Its Mot. for Summ. J. [77] at 8.) The court considers each argument in turn.

**i. 1:1 Supervision Assignments**

First, the court notes it is not clear that assignment to the 1:1 supervision role constitutes an "adverse employment action" for purposes of federal employment law. *Paterakos v. City of Chicago*, 147 F.4th 787, 795 (7th Cir. 2025). In *Muldrow v. City of St. Louis*, 601 U.S. 346 (2024), the Supreme Court recognized that discriminatory job transfers violate Title VII—even if there is no evidence that the change was "significant"; but unlike the plaintiff in that case, who was reassigned to an entirely new position, *id.* at 352–53, Plaintiff specifically acknowledged that 1:1 supervision is a core responsibility for a nurse at JMDC. (DSOF [76] ¶ 44.) Notably, to meet the medical supervision needs at JMDC, "any nurse could be assigned to 1:1 supervision, including the Director of Nursing, Ohlwine." (*Id.* ¶ 27.) Plaintiff was never transferred to a new location, moved to a different position within the same location, asked to do something entirely different than she was doing before, or permanently relegated to a less desirable role. Instead, Plaintiff

was allegedly assigned to work she believed to be less desirable more often than other nurses. "Not everything that makes an employee unhappy qualifies as an adverse action for Title VII, and this is particularly true" where the plaintiff "primarily complains of assignments or tasks consistent with the job duties." *Rhodes v. Ill. Dep't of Transp.*, 359 F.3d 498, 505 (7th Cir. 2004), *overruled on other grounds by Ortiz*, 834 F.3d at 765-66.

But assuming that repeated assignment to 1:1 supervision is deemed an adverse employment action, Plaintiff's claim fails because she has presented no evidence that the assignments were based on race. Defendant has explained that when determining which nurse would be assigned to 1:1 supervision, Defendant first attempted to utilize a contractual staffing agency nurse before using one of the nurses employed by Defendant who were subject to the applicable CBA. (DSOF [76] ¶¶ 31, 32.) Plaintiff does not meaningfully dispute this. Instead, Plaintiff claims that similarly situated white contract nurses kept their original assignments while Plaintiff was reassigned to 1:1 supervision far more frequently than reflected on the weekly schedule. (PSOF [83] ¶ 10.) The court assumes that white contract nurses, including Smoode, Bice, Rinaldo, and Taylor Scariot, were similarly situated employees whose "whose performance, qualifications, and conduct are comparable in all material respects." *Boss v. Castro*, 816 F.3d 910, 917 (7th Cir. 2016). But Plaintiff offers little more than her own belief that these individuals were treated more favorably, and the only documentary evidence in the record shows that other contract nurses employed at JMDC at the relevant times were assigned to 1:1 supervision at approximately the same rate as Plaintiff.[7] (DSOF [76] ¶¶ 43, 55–57.) Her claim of disproportionate 1:1 assignments fails.

[7] Although the parties have not commented on this, the court notes that some of Plaintiff's comparators called off work more frequently than she did, which may have resulted in Plaintiff being assigned to 1:1 shifts those comparators would otherwise have worked. If this is true, it would support Plaintiff's claim that she was assigned to 1:1 supervision more frequently than others—but not that this disproportionate rate of assignment has anything to do with her race.

### ii. Denial of Breaks

Plaintiff's denial of breaks claim fails for a similar reason. Ohlwine testified that breaks were provided to any nurse as operational needs allowed. (DSOF [76] ¶ 28.) A plaintiff's "own uncorroborated, conclusory statements that similarly situated co-workers were treated differently" are insufficient to defeat summary judgment. *Oest v. Ill. Dep't of Corr.*, 240 F.3d 605, 614 (7th Cir. 2001), *overruled on other grounds by Ortiz*, 834 F.3d 760.

The court notes, further, that although Plaintiff believes that 1:1 sitting assignments without breaks caused knee pain and physical injury, she offers no medical records or evidence to support this claim. Without more, no reasonable jury could find that the alleged denial of breaks was a product of race discrimination or that her injuries were caused by these denials.

## II. Race-Based Harassment and Hostile Work Environment

Plaintiff also asserts that she was the victim of a hostile work environment under Title VII. To prove such a claim, she must show that "(1) [s]he was subject to unwelcome harassment; (2) the harassment was based on [her] race; (3) the harassment was severe or pervasive so as to alter the conditions of the employee's work environment by creating a hostile or abusive situation; and (4) there is a basis for employer liability." *Williams v. Waste Mgmt. of Illinois, Inc.,* 361 F.3d 1021, 1029 (7th Cir. 2004). Under Title VII, an employer is liable for a hostile work environment when "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Jones v. Das*, 164 F.4th 1024, 1032 (7th Cir. 2026) (quoting *Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 982 (7th Cir. 2014)).

In considering whether the conduct rises to the level of a hostile work environment, courts utilize a "totality of the circumstances" approach. *Scaife v. U.S. Dep't of Veterans Affs.*, 49 F.4th 1109, 1116 (7th Cir. 2022). Courts will consider a variety of factors, including "the frequency of improper conduct, its severity, whether it is physically threatening or humiliating (as opposed to a mere offensive utterance), and whether it unreasonably interferes with the employee's work

performance." *Boss v. Castro*, 816 F.3d 910, 920 (7th Cir. 2016); *Gates v. Bd. of Educ. of Chi.*, 916 F.3d 631, 636–37, 640–41 (7th Cir. 2019). While the environment need not be "hellish," "simple teasing, offhand comments, and isolated incidents (unless extremely serious)" are not enough. *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (citations omitted); *Alamo v. Bliss*, 864 F.3d 541, 550 (7th Cir. 2017) ("[A] workplace need not be 'hellish' to constitute a hostile work environment").

Taking the facts in the light most favorable to Plaintiff, she was: (1) repeatedly assigned to the inferior "sitter" role, (2) not allowed to take breaks, and (3) repeatedly assigned to care for dangerous patients. (Second Am. Compl. [32] ¶ 52.) Plaintiff offers no evidence to show that these instances were based on her race. In any event, these relatively minor instances were not "sufficiently severe or pervasive to alter the conditions of [Plaintiff's] employment and create an abusive working environment." *Jones*, 164 F.4th at 1032 (quoting Alexander, 739 F.3d at 982).

Plaintiff also asserts that she was targeted "because [she] was Black," and was "singled out," "degraded," and was subjected to duties not imposed on white agency nurses. (Pl. Resp. to DSOF [82] ¶ 50.) No reasonable jury could find that the evidence she offers—little more than vague and conclusory statements that she was "being 'singled out,' 'degraded,' 'laughed at,' and 'talked about,'" with few additional details (PSOF [83] ¶ 24)—meets the high bar to establish a hostile work environment. Plaintiff does point out that she thought she heard a technician named Mindy (whose last name is not apparent from the record) calling her a "Black B—"[8] (Pl. Resp. to DSOF [82] ¶ 52), but a single incident of offensive name calling is not enough to qualify as a hostile work environment. *Cf. Rodgers v. W.-S. Life Ins. Co.*, 12 F.3d 668, 671, 678 (7th Cir. 1993) (finding an actionable hostile work environment when supervisors and employees referred to plaintiff by the term "ni***r" between five and ten times during his employment); *see also*

8 The date of this incident is unclear from the record. Further, when asked during her deposition whether Mindy was a supervisor, Plaintiff responded: "No.· I don't remember her being no supervisor. They said another person was a supervisor.· I don't remember her being one." (Pl. Dep. [76-10] at 65:15–18.)

*Faragher,* 524 U.S. at 788 (finding that offhand comments and isolated incidents, unless extremely serious, are not enough to constitute a hostile work environment). The court has no praise for workplace bullying or ugly and demeaning comments, but no reasonable jury could find Plaintiff's experience to be so severe or pervasive to meet the standard of a hostile work environment. *See Stephens v. Erickson*, 569 F.3d 779, 790 (7th Cir. 2009) ("Title VII does not set forth a general civility code for the American workplace." (cleaned up)).

Further, even assuming the work environment was hostile, there is no basis here for holding Defendant liable. Under Title VII, employers can be held liable for a hostile work environment premised on coworker harassment only if the employer behaved negligently "either in discovering or remedying the harassment." *Nischan v. Stratosphere Quality, LLC*, 865 F.3d 922, 931 (7th Cir. 2017). To show negligence, an employee generally must show that the employer had "notice or knowledge of the harassment"—that is, that the employer had "'enough information so that a reasonable employer would think there was some probability' of the harassment" occurring. *Equal Emp. Opportunity Comm'n v. Vill. At Hamilton Pointe LLC*, 102 F.4th 387, 403 (7th Cir. 2024) (quoting *Durkin v. City of Chicago*, 341 F.3d 606, 612 (7th Cir. 2003)). Plaintiff has identified just one internal report she made: a text message sent to Ohlwine.[9] (DSOF [76] ¶ 45.) Ohlwine responded promptly to Plaintiff's text message, asking, "when would you like to meet and discuss?" (*Id.* ¶ 47.) After speaking with Plaintiff, Ohlwine placed her on shifts avoiding the Keller home, as operational needs allowed. (*Id.* ¶ 48.) Because Plaintiff's message concerned two mental health technicians not under Ohlwine's chain of command, Ohlwine also spoke with their supervisor. (*Id.* ¶ 49; Pl. Resp. to DSOF [82] ¶ 49.) Furthermore, Ohlwine testified that "reports of staff being rude . . . were immediately followed up the next business day once I had received them." (DSOF [76] ¶ 29.) None of this evidence is meaningfully

---

[9] Plaintiff periodically refers to verbal reports she made to other supervisors. (*E.g.*, PSOF [83] ¶ 24.) But the evidence that these reports took place is essentially non-existent.

disputed by Plaintiff, nor has she identified any complaints that she made that IDHS did not immediately follow up on.

Taking the evidence in the light most favorable to Plaintiff, the September 3, 2023 text message and meeting between Plaintiff and Ohlwine sufficiently put Ohlwine on notice of Plaintiff's claims that her co-workers engaged in abusive conduct, but there is no evidence that Ohlwine was negligent in his response. Instead, Ohlwine took prompt steps to help address the situation and Plaintiff's concerns. In light of his prompt action, Defendant IDHS is not liable for creating a hostile work environment. Nor could a reasonable jury find that Plaintiff's voluntary departure from IDHS three weeks later was a constructive discharge.

## CONCLUSION

The Defendant's motion for summary judgment [75] is granted. The Clerk is directed to enter judgment in favor of Defendant and against Plaintiff.

ENTER:

Dated: September 2, 2026

REBECCA R. PALLMEYER
United States District Judge